# UNITED STATES DISTRICT COURT

### for the
### District of Alaska

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>An Apple iPhone located in a black Dodge Durango with<br>Alaska license plate GMM593, and currently in the<br>possession of the FBI, Anchorage, Alaska | )<br>)<br>)<br>)<br>)<br>)    Case No. 3:15-mj-00067-KFM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ District of _____ ALASKA _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2251(a), 1591,<br>and 2422(b); and<br>21 U.S.C. § 841(a)(1) | Production of Child Pornography; Sex Trafficking of a Minor, or by Force, Fraud,<br>and Coercion, and Coercion and Enticement of a Minor; and<br>Distribution of Controlled Substances |

The application is based on these facts:

See Attached Affidavit of TFO Dawn Neer

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Signature Redacted*

_____

Dawn Neer, TFO, FBI Innocence Lost Task Force
*Printed name and title*

Sworn to before me and signed in my presence.

/s/ Kevin F. McCoy
U.S. Magistrate Judge
SIGNATURE REDACTED

Date: 2-24-2015

_____
*Judge's signature*

City and state: Anchorage, Alaska

Magistrate Judge Kevin F. McCoy
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRIC OFALASKA

| IN THE MATTER OF THE SEARCH OF | Case No.: 3:15-mj-00060 KFM |
|---|---|
| An Apple iPhone located in a black Dodge Durango with Alaska license plate GMM593, and currently in the possession of the FBI, Anchorage, Alaska | **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, DAWN NEER, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND TASK FORCE OFFICER BACKGROUND

1.      I am Detective with the Anchorage Police Department (APD) and have been employed by the APD for over 17 years.  I am currently an FBI Task Force Officer (TFO) with the Child Exploitation Task Force.  As an FBI TFO, I am authorized and assigned to investigate and have State and Federal experience investigating prostitution, commercial sexual exploitation, sex trafficking and human trafficking.

2.      This search seeks evidence, fruits, and instrumentalities relating to a violations of 18 U.S.C. §§  2251(a), production of child pornography; 1591, sex trafficking of minors, or by force, fraud, and coercion; and 2422(b), coercion and enticement of a minor; and 21 U.S.C. § 841(a)(1), distribution of controlled substances, from an Apple iPhone located in a black Dodge Durango with Alaska

FEB 2 4 2015

1

license plate GMM593, and currently in the possession of the FBI, Anchorage, Alaska (hereinafter "SUBJECT DEVICE").

3.     I make this affidavit in support of an application for a search warrant authorizing the examination of the SUBJECT DEVICE, which is identified in Attachment A, and are currently in law enforcement possession at the Anchorage Federal Bureau of Investigation (FBI) Evidence Vault, and to seize the items specified in Attachment B, which constitute instrumentalities, fruits, contraband, and evidence of violations of 18 U.S.C. §§ 2251(a), 1591, and 2422(b), and 21 U.S.C. §§ 841 (a)(1), in whatever form they may be found.

4.     The statements in this affidavit are based in part on information provided to me by other law enforcement officers, police reports and on my own investigation of this matter. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have only set forth the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violation of 18 U.S.C. §§ 2251(a), 1591, and 2422(b), and 21 U.S.C. § 841(a)(1).

## RELEVANT STATUTES

5.     The following statutes are relevant to this affidavit:

    a. 18 U.S.C. § 2251 (a)  prohibits any person who employs, uses, persuades, induces, entices or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports

FEB 2 4 2015

2

any minor in of affection interstate or foreign commerce, or in any Territory or Possession of United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

b. 18 U.S.C. § 1591 prohibits a person from knowingly in or affecting interstate or foreign commerce from recruiting, enticing, harboring, transporting, providing, obtaining, or maintaining by any means a person or benefiting, financially or by receiving anything of value, from participation in a venture which has engaged in an act described above, knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act.

c. 18 U.S.C. § 2422(b), prohibits using the mail or any facility of interstate of foreign commerce, to knowingly persuade, induce, entice, or coerce, any individual who has not attained the age of 18 years, to engage in any sexual activity for which any person can be charged with a criminal offense, or attempt to do so.

KFM

FEB 2 4 2015

3

d. 21 U.S.C. § 841 (a)(1), prohibits any person to knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

## DEFINITIONS

6.　Based on my training and experience, I use the following technical terms to convey the following meanings:

a. *Commercial Sex Act:* The term commercial sex act means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3).

b. *Coercion:* The term coercion means threats of serious harm to or physical restraint against any person, any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraining against any person; or the abuse or threatened abuse of law or the legal process. 18 U.S.C. § 1591(e)(2).

c. *Serious Harm:* The term serious harm means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm. 18 U.S.C. § 1591(e)(4).

KFM

FEB 2 4 2015

4

d. *Computer:* The term "computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. §§ 2256(6) and 1030(e)(1). As used herein, a computer includes a cell phone, smart phone, tablet, and other similar devices capable of accessing the Internet.

e. *Computer Hardware:* The term "computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices such as video gaming systems, electronic music playing devices, and mobile phones); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access

5

FEB 2 4 2015

to computer hardware (including, but not limited to, physical keys and locks).

f. *Computer Passwords and Data Security Devices:* The term "computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g. *Computer Software:* The term "computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

FEB 2 4 2015

6

h. *Computer-Related Documentation:* The term "computer-related documentation" means written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i. *Exif data* refers to 'Exchangeable Image File" data and it is the information that a camera stores in relation to the picture taken. This information may include date and time information, camera settings such as the camera model and make, information about the image that varies with each image, a thumbnail for previewing the picture on the camera's LCD screen, in file managers, or in photo manipulation software, etc.

j. *Internet:* The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

k. *Internet Connection:* The term "Internet connection" means a connection required for access to the Internet. The connection would generally be provided by cable, DSL (Digital Subscriber Line), wireless devices, or satellite systems.

l. *Internet Service Providers:* The terms "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and

7

businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

m. *Minor:* The term "minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

n. *Storage Medium:* The term "storage medium" refers to any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

KFM

FEB 2 4 2015

8

o. *Visual Depictions:* "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

p. *Wireless Network:* The term "wireless network" means a system of wireless communications in which signals are sent and received via electromagnetic waves such as radio waves. Each person wanting to connect to a wireless network needs a computer which has a wireless network card that operates on the same frequency. Many wired networks base the security of the network on physical access control, trusting all the users on the local network. But, if wireless access points are connected to the network, anyone in proximity to the network can connect to it. A wireless access point is equipment that connects to the modem and broadcasts a signal. It is possible for an unknown user who has a computer with a wireless access card to access an unencrypted wireless network. Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

## PROBABLE CAUSE

7.   On December 21, 2014, a family member of a 16-year-old victim (herein "JUVENILE A") reported to the Anchorage Police Department (APD) that STEVEN MADDOX, date of birth August 7, 1960, had sexually assaulted

9

FEB 2 4 2015

JUVENILE A. It was further reported that MADDOX provided "molly" (a synthetic drug sometimes comprised of MDMA) to JUVENILE A and made her engage in oral sex with him in exchanged for the drugs.

8.  On February 3, 2015, JUVENILE A was interviewed by APD Det. Chris Thomas. During that interview, JUVENILE A disclosed the following information:

*Initial Contact between MADDOX and JUVENILE A*

a.  JUVENILE A met MADDOX through JUVENILE B (15 years old). JUVENILE B referred to MADDOX as her "drug man."

b.  JUVENILE A met MADDOX approximately 3 months ago with JUVENILE B. JUVENILES A and B were going to meet up with MADDOX to purchase molly. MADDOX came to JUVENILE B's residence. JUVENILE A and B went outside and they exchanged $80 for $100 worth of drugs provided by MADDOX. MADDOX asked JUVENILE B if she wanted to "roll around" with him. JUVENILES A and B "took lines" (of drugs) and JUVENILE A recalled doing 8 lines of ecstasy. The ecstasy came in the form of pills and they extracted the powder from them.

c.  JUVENILE A described MADDOX's vehicle as black and "really nice," and said it reminded her of a Lexus or a Honda. She believed it was a newer SUV. (According to Alaska Public Safety Information Network [APSIN], MADDOX is the registered owner of a black 2012

10

Dodge Durango at 6004 E. 22nd Avenue, Anchorage, AK. On February 11, 2015, TFO NEER drove by 6004 E 22nd Avenue, Anchorage, Alaska, and observed that a black Dodge Durango bearing Alaska license plate #GMM593 was parked in the driveway of the residence.)

d. MADDOX told the juveniles that he wanted to go somewhere safe because he was giving them drugs and alcohol. MADDOX drove the juveniles to the parking of strip club where JUVENILE A described seeing a "pink girl" on the side of the building. She later described a large sign that showed a "really big girl." (On February 19, 2015, TFO Neer drove to the Crazy Horse strip club in Anchorage, Alaska and observed a neon sign of a female form on the southwest corner of the building. The building also has pink trim; within the pink trim is the picture of a female silhouette. The silhouette is black in color.)

e. While in the parking lot, MADDOX asked JUVENILES A and JUVENILE B, both under the influence of drugs and alcohol, to engage in sexual activity with each other; JUVENILES A and B complied. He then had both juveniles perform oral sex on him. JUVENILE A asked MADDOX if it turned him on knowing how young they were and he replied that it did.

///

///

KFM

FEB 2 4 2015

11

*Contact between MADDOX & JUVENILE A on Halloween 2014*

f. The weekend of Halloween 2014, JUVENILE A contacted MADDOX to buy pills. MADDOX met JUVENILE A near her residence and sold JUVENILE A five pills. After purchasing the pills, JUVENILE A exited MADDOX'S car and nothing further occurred.

g. MADDOX had previously sent text messages to JUVENILE A stating "I got what I gave you last time". He also texted her one morning after giving her drugs asking her how her "high" was.

*Contact between MADDOX and JUVENILE A after Halloween 2014*

h. About a month after Halloween 2014, MADDOX told JUVENILE A that he wanted to speak to her. She agreed to meet with him and he picked her up outside of her residence.

i. MADDOX told JUVENILE A that he wanted to take pictures of her and handed her some molly. JUVENILE A agreed and MADDOX took JUVENILE A to an Anchorage motel. While driving to the motel, MADDOX told JUVENILE A she could make money if she did dances or gave blowjobs.

j. When they arrived at the motel, MADDOX brought a large bag into the motel room. The bag was large, black and shiny and had two handles that MADDOX could hold. Inside the bag were sex toys and JUVENILE A described one of them as a purple dildo. JUVENILE A saw a large camera that she described as being like the cameras that

news people use.  MADDOX told JUVENILE A she could make money if she did videos with the sex toys.  JUVENILE A was scared that MADDOX was going to do something to her.

k.  MADDOX told JUVENILE A to take her to take her clothes off and he started to explain how things work "from there on out."  MADDOX told her that he would hold her money whenever she earned it. MADDOX told her that when he asked for a blowjob she should give him one.

l.  MADDOX told JUVENILE A to give him "head."  JUVENILE A stated he was "basically trying to teach me."  She performed oral sex on MADDOX because he told her to and that he said she had to do what he said.  JUVENILE A felt confused and she thought that she had to listen because he told her that she needed to.

m.  MADDOX laid JUVENILE A on the bed with her head facing the ceiling.  MADDOX forced his penis into her mouth.  JUVENILE A said that he began thrusting himself inside of her mouth. JUVENILE A was crying and scared and she told him to stop.  She then threw up.  MADDOX told her next time she needed to "finish." JUVENILE A told MADDOX she needed to go home.   MADDOX kept stalling and making up rules.  He told her he would hold her money when she got it and that he was making excuses for why he would never take her money.  He pulled a wad of cash from his

13

FEB 2 4 2015

pocket and told her he didn't need her money but he wanted to hold it for her.

n. MADDOX told JUVENILE A that she could make money by making videos, dancing, doing "oral," having sex, or taking pictures. MADDOX did not tell her who she had to do these things with but told her he had "people."

o. MADDOX specifically told JUVENILE A that she could make a video with a sex toy and that if she played with herself then it would be [worth] more money than just taking photographs. He told JUVENILE A she could make $300 for a blowjob.

p. JUVENILE A believed MADDOX had taken photographs of JUVENILE B because JUVENILE B had shown her a picture of herself on a pole at MADDOX'S strip club. JUVENILE A believed MADDOX worked at the strip club he had taken them to the first time JUVENILE A met him.

9. In 2013, APD received a complaint that MADDOX was dealing drugs out of the Crazy Horse strip club. This report was not investigated.

*Cell Phone Contact between MADDOX and "JUVENILE A"*

10. On February 13, 2015, TFO Neer contact a family member of JUVENILE A who provide JUVENILE A'S cell phone along with the consent to take over her identity. The following text message conversations occurred between MADDOX and TFO Neer posing as JUVENILE A. This conversation was

14

FEB 2 4 2015

with MADDOX at cell phone number 907-240-1105. This number was provided by JUVENILE A, and was also linked to MADDOX through a prior police report. Those conversations are as follows:

///

a. <u>February 15, 2015, from 4:43 pm to 6:31 pm</u>

    i. To MADDOX: Hey is JUVENILE A[1]

    ii. From MADDOX: Hey

    iii. To MADDOX: Wats up

    iv. From MADDOX: Not much what's up with you

    v. To MADDOX: Idk. In denver. Bored

    vi. From MADDOX: You are there?

    vii. From MADDOX: Why

    viii. To MADDOX: My bitch mom snt me here but will b bak weds

    ix. From MADDOX: Why what she do that for

    x. To MADDOX: Thot I needed treatment

    xi. From MADDOX: You ok?

    xii. To MADDOX: Yeah jst wanna go home. Make $ so I can do my thing.

    xiii. From MADDOX: Haven't seen you in a long time we need to get together and talk.

---

[1] The true name of Juvenile A was used in the original text message. It has been redacted to protect the juvenile victim's privacy.

Case 3:15-mj-00067-KFM   Document 1   Filed 02/24/15   Page 16 of 64

xiv. From MADDOX: How you looking these days

xv. From MADDOX: How's your home girl haven't seen her either

xvi. To MADDOX: Gud. May b better then b4

xvii. To MADDOX: Idk not allowed to c her

xviii. From MADDOX: Oh dam why

xix. To MADDOX: Moms a BITCH. Trying to control me.

xx. From MADDOX: Who you with in Denver

xxi. To MADDOX: My aunt. I left treatment that shit is fucked up

xxii. From MADDOX: Your mom gonna let you come back

xxiii. To MADDOX: Yeah she bot ticket 2day

xxiv. From MADDOX: Sweet

xxv. From MADDOX: What you gonna do when you get back

xxvi. To MADDOX: You still think I can make some $$ wen I come bck

xxvii. From MADDOX: Yes if you want to

xxviii. From MADDOX: We will get together and talk

xxix. To MADDOX: K

xxx. To MADDOX: Is it $$ wit the toys or the other thing

xxxi. From MADDOX: Send me some pics so I can see how good you look

xxxii. From MADDOX: We will talk about everything

xxxiii. To MADDOX: K

*KFM*

FEB 2 4 2015

xxxiv. (TFO NEER sent a head shot photo of JUVENILE A to MADDOX)

xxxv. From MADDOX: Nice

xxxvi. From MADDOX: $$$

xxxvii. To MADDOX: How much $$$

xxxviii. From MADDOX: How much you trying to make

xxxix. From MADDOX: What's your plans

xl. To MADDOX: My own plce

xli. From MADDOX: How much you got put away any

xlii. To MADDOX: None. U said 300 4 bj

xliii. From MADDOX: We will talk about everything when you get here

xliv. To MADDOX: K

xlv. From MADDOX: Everything has to be at the right time and right place.

xlvi. From MADDOX: Need lots of Pics to promote you

xlvii. To MADDOX: U take em or someone else cuz I only no u.

xlviii. From MADDOX: K

xlix. To MADDOX: So you take em?

l. From MADDOX: K

li. From MADDOX: Make you look like a supermodel

lii. To MADDOX: K

KFM

FEB 2 4 2015

liii. From MADDOX: were you going to be Staying at

liv. To MADDOX: Moms I guess. Got no were Elzevir

lv. To MADDOX: Oops. Elze

lvi. From MADDOX: We'll send me lots of good pics so I can get started

lvii. To MADDOX: Can't tak those at aunts house. Need help when I get bck

lviii. From MADDOX: Bathroom

lix. To MADDOX: K I try

lx. To MADDOX: Do I need sumthing lik u brot in bag

lxi. From MADDOX: What ever you got

lxii. To MADDOX: K

lxiii. From MADDOX: You know what to do

lxiv. To MADDOX: K

lxv. From MADDOX: Real soon

lxvi. To MADDOX: on fone w mom

lxvii. From MADDOX: K

lxviii. To MADDOX: Fuckin mom. Said I have to go bck to school. Fucked. Up. I'm so fuvkin pissed. She said cuz I'm 16 I have 2 do wat she says. Fuck that.

lxix. From MADDOX: Well dam

lxx. To MADDOX: Wat shuld I do

18

FEB 2 4 2015

**lxxi.** From MADDOX: I don't know for some reason thought you were 18

**lxxii.** From MADDOX: Well it will work it self out when you get here

**lxxiii.** To MADDOX: Can I still mak $$? I need out of my house

**lxxiv.** From MADDOX: You can always make money stay on track talk about everything when you get here

**lxxv.** To MADDOX: Fuck....K

**lxxvi.** From MADDOX: Stay focused

**lxxvii.** From MADDOX: $$$$

b. <u>February 15, 2015 7:53 pm – 7:58 pm</u>

   **i.** From MADDOX: Wyd

   **ii.** To MADDOX: Hangin wit cuzin watchin movie

c. <u>February 15, 2015, 9:04 pm</u>

   **i.** From MADDOX: What time is it there

d. <u>February 17, 2015, 12:12 am</u>

   **i.** From MADDOX: Hey

e. <u>February 17, 2015, 5:59 pm – 7:39 pm</u>

   **i.** To MADDOX: Hey

   **ii.** From MADDOX: Hey

   **iii.** To MADDOX: Fon died and aunt wud not get me a charger till today.

FEB 2 4 2015

iv. From MADDOX: So what good

v. To MADDOX: I Lv 2marrow

vi. From MADDOX: Happy?

vii. To MADDOX: Fuck ya

viii. From MADDOX: What's the first thing you going do when you get home

ix. To MADDOX: Idk

x. From MADDOX: is she going to have you on lockdown

xi. To MADDOX: Prob but she had 2 go 2 wrk the next day so idk

xii. From MADDOX: Does your homegirl know you're coming back

xiii. To MADDOX: Idk. We don't hany any more

xiv. From MADDOX: you don't like her anymore

xv. To MADDOX: Ya. Things weird since that night so idk

xvi. From MADDOX: Oh damn that sucks

xvii. From MADDOX: you okay with that

xviii. To MADDOX: Ya I guess. I kinda wish we didn't do that in ur car. & She thot I got her car impounded.

xix. From MADDOX: Why did she talk shit to you and I didn't know he had a car

xx. To MADDOX: It was her bfs car or sumthing idk. She just got pissed.

FEB 2 4 2015

**xxi.** From MADDOX: well if it's meant to be you guys will work it out

**xxii.** From MADDOX: if not then it wasn't a real friendship

**xxiii.** To MADDOX: Ya idc. I'm gud

**xxiv.** From MADDOX: and you didn't do anything wrong in the car

**xxv.** From MADDOX: you were just having fun

**xxvi.** To MADDOX: It was weird after

**xxvii.** From MADDOX: why because you guys never done that before?

**xxviii.** From MADDOX: She's no angel

**xxix.** To MADDOX: I think b cuz you watched made it weird for us. Idk

**xxx.** To MADDOX: It's fine. Idc

**xxxi.** From MADDOX: so you kind of mad at me

**xxxii.** To MADDOX: Na

**xxxiii.** From MADDOX: we good

**xxxiv.** To MADDOX: Ya. I hope so.

**xxxv.** From MADDOX: what does that mean

**xxxvi.** To MADDOX: It means we r ok

**xxxvii.** From MADDOX: good

**xxxviii.** To MADDOX: So I took the pics but Idk. I think ther bad.

**xxxix.** From MADDOX: Send them and I will tell you

FEB 2 4 2015

xl. To MADDOX: Wat u doing wit them?

xli. From MADDOX: Just looking and letting you know remember we will talk when you get here about everything

xlii. To MADDOX: K

xliii. To MADDOX: (TFO NEER send a photo of a unknown female wearing a zipper sweatshirt partially exposing the top and inside portion of a woman's breasts that was downloaded from a publicly-available website)

xliv. To MADDOX: I don't like other I'm not sending thos

xlv. From MADDOX: Send them

xlvi. To MADDOX: Will that one work?

xlvii. From MADDOX: No

xlviii. To MADDOX: Like how. Idk

xlix. From MADDOX: Just feel like a model and feel it

l. To MADDOX: Weird wen I hold camera

li. From MADDOX: Trust yourself

lii. From MADDOX: Ok

liii. To MADDOX: K. I can't do it. I don't want my face in it.

liv. From MADDOX: don't out your face that way you can do it and think money

lv. To MADDOX: K

lvi. To MADDOX: They all turn out stupid

FEB 2 4 2015

lvii.   From MADDOX:  Baby girl just feel sexy

lviii.  To MADDOX:  Can I do it wen my aunt goes to bed

lix.    From MADDOX:  Yes babe

lx.     To MADDOX:  How many pics do I need to get my own place

lxi.    To MADDOX:  I'm sorry I suck at the pics

lxii.   To MADDOX:  R u mad at me

lxiii.  From MADDOX:  Think about Molly and tak picsno I want to feel good about yourself I'm not mad at all

lxiv.   To MADDOX:  I

lxv.    To MADDOX:  Oops. K

f.  February 17, 2015 9:25 pm – 9:32 pm

  i.   From MADDOX:  ????

  ii.  To MADDOX:  Sorry fell asleep.  Have to het up earloe for plane.

  iii. From MADDOX:  Okay

11.    Your affiant reviewed Alaska Department of Motor Vehicle and Alaska Public Safety Information Network (APSIN) records for STEVEN MADDOX.  On August 7, 2014, MADDOX provided his address to DMV/APSIN as 6004 E 22nd Avenue, Anchorage, Alaska.  Alaska DMV records show a black 2012 Dodge Durango registered to STEVEN MADDOX, with Alaska license plate GMM593.

_KFM_

FEB 2 4 2015

23

12.     On February 11, 2015, TFO Neer drove by 6004 E. 22nd Avenue, Anchorage, Alaska. The black Dodge Durango registered to MADDOX was parked in the parking lot of the residence. The residence was a one-story ranch style house that is blue and white in color with a car port on the west side of the structure.

13.     On February 17, 2015, TFO Neer reviewed Alaska Department of Labor records that show no records of employment for MADDOX since 2008.

14.     On February 18, 2015, TFO Neer reviewed toll records for JUVENILE A's cell phone provided by a family member of JUVENILE A. These records show the first text message between JUVENILE A and 907-240-1105 starting on October 24, 2014. Eight text messages and a single phone call occurred on the night of October 24, 2014, starting at 11:34 pm, and ending at 3:44 am (October 25, 2014). The following additional contacts were observed:

    a.  One phone call placed by JUVENILE A to 907-240-1105 at 10:17 pm on October 25, 2014, followed by a text message from JUVENILE A at 10:30 pm.

    b.  On Saturday, November 8, JUVENILE A called 907-240-1105 between 6:26 pm and 8:11 pm.

    c.  On Sunday, November 9, 2014, JUVENILE A called 907-240-1105 three times between 3:33 am and 4:02 am.

    d.  On Friday, November 14, 2014, JUVENILE A called 907-240-1105 at 1:01 am, and 2:46 am, and again at 9;45 pm.

KFM

FEB 2 4 2015

15.     On Saturday, November 15, 2014, JUVENILE A called 907-240-1105 at 12:49 am.

16.     On February 18, 2015, TFO Neer obtained search warrants 3:15-mj-00060-KFM and 3:15-mj-00061-KFM authorizing the search of MADDOX's residence and person, respectively.

17.     Additional communications between TFO Neer (posing as JUVENILE A) and MADDOX occurred following issuance of the above warrants. Those communications were as follows:

    a.  <u>February 19, 2015 2:31 p.m. – 2:47 p.m.</u>

        i.  To MADDOX:  Hey

        ii.  From MADDOX:  Hey

        iii.  To MADDOX:  Can u com get me

        iv.  From MADDOX:  I'm in Kenai right now where you at

        v.  To MADDOX:  Dimond ctr

        vi.  From MADDOX:  Dam I will be back tonight what's up

        vii.  To MADDOX:  I wan (pill emoticon)

        viii.  From MADDOX:  Who you wit

        ix.  To MADDOX:  Friends but they cool

        x.  From MADDOX:  i'll be back in town tonight so you gonna out and about

        xi.  To MADDOX:  When

        xii.  From MADDOX:  After 9

FEB 2 4 2015

xiii.  To MADDOX:  Fuck

xiv.  From MADDOX:  Take that long to get back in town

xv.  To MADDOX:  K

xvi.  From MADDOX:  Send me a pic right now!!

xvii.  To MADDOX:  U on way now

xviii.  From MADDOX:  Soon

xix.  To MADDOX:  (TFO NEER sent picture of Juvenile A, face only.)

xx.  To MADDOX:  I can't wait till 9.  That's crazy shit

xxi.  From MADDOX:  You're ain't on lockdown?

xxii.  To MADDOX:  No

xxiii.  To MADDOX:  Not really

xxiv.  From MADDOX:  Where you going be around nine

xxv.  To MADDOX:  Idk.  That fuckin long time

xxvi.  From MADDOX:  When you find out let me know and you to be by yourself or what

xxvii.  To MADDOX:  Idk.  Needed you now

xxviii.  From MADDOX:  i'll get back as soon as I can

xxix.  To MADDOX:  K

xxx.  From MADDOX:  Should it me up so you landed

xxxi.  To MADDOX:  My mom was crazy.

xxxii.  From MADDOX:  Been cool now

FEB 2 4 2015

xxxiii.  To MADDOX:  Huh

xxxiv.  From MADDOX:  Is mom's being cool now

xxxv.  To MADDOX:  She had to Lv me somewhere

xxxvi.  From MADDOX:  Keep $$$$ on in the back of your mind

xxxvii.  To MADDOX:  I am

b.  <u>February 19, 2015 8:46 p.m. – 9:14 p.m.</u>

    i.  To MADDOX:  Hey

    ii.  From MADDOX:  Hey

    iii.  From MADDOX:  Wyd

    iv.  To MADDOX:  Waitin 4 u

    v.  From MADDOX:  Where you at

    vi.  To MADDOX:  Friends house

    vii.  From MADDOX:  I'm still drivin almost in town

    viii.  To MADDOX:  K

    ix.  From MADDOX:  What we gonna get into

    x.  To MADDOX:  Huh

    xi.  From MADDOX:  Tonight anything

    xii.  To MADDOX:  I wan to get some (pill emoticon)

    xiii.  From MADDOX:  ??Kind

    xiv.  To MADDOX:  Same as last time.

    xv.  From MADDOX:  So we not talking tonight

    xvi.  To MADDOX:  Yeah

FEB 2 4 2015

xvii. To MADDOX:  Wan that too

xviii. From MADDOX:  So are you coming with me or staying with your friend

xix. To MADDOX:  With u.  U said u help me wit $

xx. From MADDOX:  okay just sounded like you wanted me to drop something off and you're staying there

xxi. To MADDOX:  No I go wit u.  If still ok

xxii. From MADDOX:  Yes it's ok

xxiii. To MADDOX:  Wen u get here?

xxiv. From MADDOX:  What time you got to be back

xxv. From MADDOX:  Still on the road driving fast

xxvi. To MADDOX:  Idk

xxvii. From MADDOX:  Roads are shit

xxviii. From MADDOX:  What part of town you at

xxix. To MADDOX:  K well I'll try & wait

xxx. To MADDOX:  Old sew

xxxi. From MADDOX:  And ?

xxxii. To MADDOX:  By Walmart

xxxiii. From MADDOX:  Find diamond

xxxiv. To MADDOX:  Ya

xxxv. To MADDOX:  U almost here

xxxvi. From MADDOX:  45 min

xxxvii.  To MADDOX:  K

xxxviii.  From MADDOX:  Send me two pics now

xxxix.  To MADDOX:  (TFO NEER sent a pic of Juvenile A sitting on the floor looking at camera.)

xl.  From MADDOX:  That's one but you can take one showing that you want $$$$

xli.  To MADDOX:  U said u wuld do that.  I not gud at it

xlii.  From MADDOX:  Just try now

xliii.  To MADDOX:  I can't.  At friends.  I need the things to do bettr job

xliv.  From MADDOX:  You need to in the bathroom and do one now

xlv.  To MADDOX:  U u being lik that

c.  <u>February 19, 2015 10:05 p.m.</u>

   i.  To MADDOX:  Wen u get here?

d.  <u>February 19, 2015 10:29 p.m.</u>

   i.  To MADDOX:  R u mad me.  I gues u didn't want c me.

e.  <u>February 20, 2015, 1:01 a.m.</u>

   i.  From MADDOX:  Sorry had to do something

f.  <u>February 23, 2015 3:49 p.m.</u>

   i.  To MADDOX:  Wtf

g.  <u>February 23, 2015 5:15 p.m.</u>

   i.  From MADDOX:  What's up

*KFM*

FEB 2 4 2015

29

    ii. To MADDOX: Nothin

h. February 23, 2015 6:32 p.m. – 6:55 p.m.

    i. To MADDOX: Y u ditch me

    ii. From MADDOX: I didn't just got pulled in to some bull shit that night

    iii. To MADDOX: K

    iv. To MADDOX: We kool

    v. From MADDOX: Always

    vi. To MADDOX: K. Thor u wer mad at me

    vii. To MADDOX: Thot

    viii. From MADDOX: No reason to be baby girl

    ix. To MADDOX: K

    x. To MADDOX: My moms gunna b gone tomarow afternoon. Can we meet up

    xi. From MADDOX: Sounds good

    xii. To MADDOX: K I'll txt you when she leaves. Can u come get me

    xiii. From MADDOX: Yes

    xiv. To MADDOX: K

    xv. From MADDOX: You can make me happy and send some pics today

    xvi. To MADDOX: Wen my moms lvs me

FEB 2 4 2015

    xvii. From MADDOX: Okay

i. <u>February 23, 2015 10:33 p.m.</u>

    i. From MADDOX: ????

    ii. To MADDOX: Still with her

    iii. To MADDOX: (TFO NEER sent picture of unknown female showing side profile of body wearing pink lace panties and covering left breast with hand.)

    iv. To MADDOX: Best I cud do earlier

    v. From MADDOX: More nice one

j. <u>February 24, 2015 between 2:09 p.m. and 2:57 p.m.</u>

    i. To MADDOX: Mom jst left. Can u com get me

    ii. From MADDOX: I was just waiting all morning I can't come now shit what about tonight?

    iii. From MADDOX: What time is he coming back

    iv. To MADDOX: I said afternoon. Ugh

    v. To MADDOX: Lik 2 or 3 hrs.

    vi. FROM MADDOX: We need to hook up and talk dam girl

    vii. To MADDOX: Fuck. Can u at bring me those things quick and meet ltr tonight.

    viii. From MADDOX: I thnk I can try to do that

    ix. To MADDOX: Okay walking to Costco now. Do nt wan neighbrs to c u.

KFM

FEB 2 4 2015

x. From MADDOX: But you need to send me some real good pics now

xi. To MADDOX: U keep fuckin wit me. If u can hook me up I send as many as u want

xii. From MADDOX: I will so do it now

xiii. To MADDOX: I'm walking give wen u get her

xiv. From MADDOX: How you gonna do that

xv. To MADOOX: Idk. Jst will.

xvi. From MADDOX: Take a pic of you walking

xvii. To MADDOX: (TFO Neer sent a "selfie" of JUVENILE A provided by JUVENILE A's mother)

xviii. From MADDOX: Way

xix. To MADDOX: Costco

xx. From MADDOX: What part

xxi. From MADDOX: Who you wit

xxii. To MADDOX: By self

xxiii. From MADDOX: I don't see u

xxiv. To MADDOX: Coming out doors. Had to pee

18. TFO Neer and MADDOX arranged to meet at the Costco on Debarr Road, Anchorage, Alaska. MADDOX was observed entering the Costco parking lot driving a black Dodge Durango. Upon his arrival into the parking lot, he was met and detained by law enforcement, and transported to the FBI offices in Anchorage,

32

FEB 2 4 2015

Alaska. During a search of MADDOX by law enforcement, he was found to be in possession of $3,100 (all in $100 bills located in his wallet), and $127 in his pocket.

19.    The Dodge Durango was driven by law enforcement agents to the FBI office in Anchorage. Observed in plain view in the vehicle was a small, clear plastic baggie with multiple yellow skulls lined up in rows. The bag was a small bag that in my training and experience are used to sell small quantities of controlled substances. Also located in the vehicle in plain view was an iPhone.

20.    On February 24, 2015, I applied for search warrant 3:15-mj-00066-KFM, authorizing a search of the black Dodge Durango with Alaska license plate GMM593. One item specifically identified to be seized as part of that search was the SUBJECT DEVICE.

## BACKGROUND ON PROSTITUTION AND THE USE OF THE INTERNET AND CELLULAR PHONES TO FURTHER PROSTITUTION

21.    Through my training and experience, I am aware of the following traits of prostitution and how the Internet and cell phones are used to further the activities of illegal prostitution:

   a. Individuals who, through enticement, intimidation, or force, enlist individuals to become prostitutes, and who profit from the prostitution of others are called "pimps." Pimps are sometimes euphemistically referred to as "management."

   b. Pimps, as well as, prostitutes who are not "managed" have embraced the internet as a means of advertising services and communicating with customers.

33

KFM

FEB 2 4 2015

c.  Certain web sites have been created to facilitate communications between prostitutes and their clients. The more notable web site relevant to prostitution in the District of Alaska includes "Backpage.com, in the "Escort" section of "Backpage.com." These web sites allow pictures to be posted as part of advertisements. I have viewed prostitution advertisements on this web site.

d.  Subjects who utilize the internet to post prostitution related advertisements on websites such as "Backpage.com" often use photographs in the advertisements. These photographs often show a nude or semi-nude female. These females are at times, under the age of 18 years old.

e.  Advertisements for prostitutes often contain codes for the services provided. For example the term "w4m" means women for men. The term "in-calls only" refer that the prostitute will be providing the location for the sexual transaction. The term "donation" is often used to mean the cost for the sexual transaction.

f.  Pimps attempt to avoid the attention of law enforcement through the high anonymity provided by the Internet.

g.  Most juvenile prostitutes have pimps. Prostitutes will often refuse to divulge the identity of their pimps to law enforcement. Most pimps often instruct their prostitutes on what to say and what not to say to law enforcement.

34

FEB 2 4 2015

h. Prostitutes are instructed by the pimp on how to detect undercover officers. When arranging "dates" with clients over the phone, prostitutes rarely discuss the details pertaining to the sexual acts that are to occur until they meet in person.

i. The pimps at times use physical force and/or fear to control their prostitutes. They control the prostitutes' actions, and collect monies earned through acts of prostitution. The pimps facilitate the prostitution by transporting the prostitutes to locations where the prostitution occurs. The pimps, at times, transport prostitutes across state lines for the purpose of prostitution.

j. Prostitutes and/or pimps often stay in motels/hotels while traveling. The prostitutes and pimps travel via rental vehicles, vehicles, airplane, or bus during their travels. The pimps utilize the monies earned during acts of prostitution to purchase food, lodging, clothing and other items.

k. Pimps often possess firearms to assist in protecting and intimidating their prostitutes.

l. The pimps sell drugs as another means to make money. The pimps often provide drugs to the prostitutes to suppress their appetites and to assist with the demands of prostituting for long periods of time.

m. Pimps can be either male or female.

KFM

FEB 2 4 2015

35

n. The term "daddy" is commonly used by prostitutes when referring to their pimps. The pimp's phone number is often programmed as "daddy" in the prostitute's cell phone.

o. Pimps often request or force their prostitutes to obtain tattoos of names and/or symbols that are related to the pimp's name or nickname.

p. Prostitutes utilize cellular telephones as a way to be contacted by clients. These phone numbers are included in the advertisements that are posted on various prostitution assisting web sites. Contact is made through phone calls as well as text messages.

q. Pimps and their prostitutes communicate with each other through cellular phones regarding prostitution activity. Communication is made through phone calls as well as text messages.

r. Pimps and prostitutes communicate with others involved in the prostitution/pimp sub-culture either by voice calls or text messages regarding prostitution/pimp activities.

s. Pimps and their prostitutes use cellular telephone cameras to take photographs of the prostitutes used in the prostitution advertisements.

t. Pimps and their prostitutes use cellular telephones to transmit photographs to email accounts and/or prostitution assisted internet sites.

KFM

FEB 2 4 2015

u. Pimps and prostitutes use personal e-mail accounts to post their advertisements on prostitution assisting web sites.

22.   It is common for individuals to carry cell phones, smart phones, tablets, and other similar devices on their person.

## INFORMATION ABOUT DRUG DISTRIBUTORS

23.   Based upon my training, experience and participation in these and other investigations involving the distribution of narcotics, and based upon my conversations with other experienced law enforcement agents and officers, with whom I work, I know the following:

a. In my experience, I have found that the distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal

37

FEB 2 4 2015

associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money.

b. I know that in <u>United States v. Terry</u>, F.2d 272 (9th Cir. 1990), <u>United States v. Angulo-Lopez</u>, 791 F.2d 1394,1399 (9th Cir.1986), <u>United States v. Hernandez-Escargega</u>, 886 F. 2d 1560, 1567 (9th Cir. 1989) and in <u>United States v. Fannin</u>, 817 F. 2d 1379, 1381-1382 (9th Cir. 1987), the court held that in the case of drug traffickers, evidence is likely to be found where dealers live and a search warrant may be properly issued against a suspected drug dealer's residence despite the lack of direct evidence of criminal activity at the residence. The court also held, in <u>United States v. Cardoza</u>, 769 F. 2d 625, 630 (9th Cir. 1985) that a search warrant may be properly issued to search a drug trafficker's storage locker despite lack of direct evidence linking the storage locker to criminal activity.

c. It is common for drug traffickers to conceal in their residences and businesses in strong boxes, safes, lock boxes, concealed compartments and hidden rooms, US currency, foreign currency, financial instruments, precious metals, jewelry, and other items of value which are proceeds from drug trafficking.

d. I know that evidence of excessive wealth, or the ability to pay for things in spite of no record of gainful employment can be probative

38

FEB 2 4 2015

evidence of crimes involving greed, to include the distribution of controlled substances. Therefore, receipts showing the expenditure of large sums of money and/or the expensive assets themselves can be evidence of drug trafficking. I also know that drug traffickers commonly keep the expensive assets themselves and/or documentation of the purchase of the asset (receipts, warranty cards, etc.) in or about their residences, and sometimes documentation of these assets in their vehicles or businesses.

e. It is common for drug traffickers to involved in the distribution of controlled substances to maintain equipment and supplies (i.e. scales, baggies, cutting agents) on hand over a lengthy period of time, even when they do not have any controlled substances on hand. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence or business. I have also found scales and packaging materials in traffickers' vehicles.

f. It is common for individuals involved in distribution of controlled substances to possess scanners, security cameras and communications equipment (i.e. cellular telephones, fax machines and computers with Internet access) to protect and conceal their operation from law enforcement and other criminals and to monitor surveillance activities of law enforcement. Computer equipment is

KFM

FEB 2 4 2015

also used by members of drug trafficking organizations to store records related to drug trafficking and money laundering activities.

g. It is common for individuals who distribute controlled substances to possess firearms and ammunition to protect their drugs, assets, and persons from rival traffickers, other criminals, and from law enforcement.

h. It is common for drug trafficking and concealment of drug trafficking activities to occur at all hours of the day and night.

24. In the past, the above-described records were often maintained by hand, in written hard copy formats that were stored in an individual's residence, vehicle, or other secure location. In recent years, many of the items described above that were formerly generated by hand and maintained in hard copy are increasingly kept in digital formats. These items include, but are not limited to, word processing documents, electronic spreadsheets, emails, text messages, digital voice mails or messages, Internet browser histories and bookmarks, social media postings, electronic receipts or other electronic communications, digital shipping records, digital financial records, and digital photographs, and are saved or accessed through on a computer, tablet, smart phone, or other Internet-capable device. This information may also be kept on various storage medium, including, but not limited to, hard drives, thumb drives, or SD cards. I know that these digital devices are often kept in the drug trafficker's residence. However, given the portable nature of modern technology, I also know that these devices may be

40

FEB 2 4 2015

kept on an individual's person, within any bags or packs carried by the person, or within their vehicles.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

25.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT DEVICE, in whatever form they are found. Based on the information described above, one form in which the records might be found in the SUBJECT DEVICE is data stored in a cell phone computer's memory or other storage media.   In this case, this is so for the following reasons:

a.  The evidence shows that MADDOX has communicated with JUVENILE A, and continues to communicate with a person he believes to be JUVENILE A, through text messages, which is typically done through a cell phone or messaging application.  In many instances, cell phones and messaging application can be synced with a computer or other digital device.

b.  JUVENILE A described seeing a video camera during the meeting with MADDOX in the month following the Halloween 2014 incident. Furthermore, there is discussion in the text messages detailed above about obtaining and taking photographs of JUVENILE A.  Finally, JUVENILE A described having seen a photograph of JUVENILE B on a stripper pole.  I know from my training and experience, that pictures and video taken with digital cameras ,whether those

41

FEB 2 4 2015

cameras are part of another device such as a cell phone, or are independent pieces of equipment, are often stored on digital devices like computers, and other removable storage media.

c. As explained above, individuals who promote and manage girls engaged in sex trafficking often rely on the Internet to promote those acts. As such, use of a computer or other Internet-accessible device is critical to modern-day sex trafficking.

d. As explained above, individuals involved in the distribution of controlled substances may maintain records of their activities on computers and other digital devices.

Accordingly, this warrant seeks authorization to search for and seize electronic storage media from the SUBJECT DEVICE, or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

26. Searches and seizures of evidence from computers and other Internet access devices require agents to seize most or all electronic items (hardware, software, passwords and instructions) to be processed later by appropriate personnel in a controlled environment. Digital storage media may include but is not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage which can be accessed by computers or other electronic devices to store or retrieve data, which can store the equivalent of thousands of pages of information. Users may store information or images in random order with deceptive file names, which requires searching authorities to

42

FEB 2 4 2015

examine all the stored data to determine whether it is included in the search warrant. This sorting process renders it impractical to attempt this kind of data search on site.

27. Searching digital evidence systems for criminal evidence requires experience in the computer and cellular telephone field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected, or encrypted files. Since digital evidence is extremely vulnerable to tampering or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

28. Computers and other digital communications devices contain volatile memory that contains information only while the device is in a powered on and/or running state. I know that powering off the device may result in the loss of the volatile information. Adding an external evidence storage device will cause minor changes to the state of the computer but will allow for the best effort in fully capturing the state of the running evidence. This capture of information requires technical expertise to ensure the resulting data can be examined by all subsequent investigators. This captured information may include current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details relevant to use of the system.

43

FEB 2 4 2015

29.     In order to fully retrieve data from a computer or other digital communications system, the analyst needs all magnetic storage media as well as the storage devices. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware access software or drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as all instruction manuals or other documentation and data security devices, and all items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software. In cases like the instant one where the evidence consists partly of image and video files, the monitor and printer are essential to show the nature and quality of the graphic images, which the system could produce. Finally, where there is probable cause to believe that the computer and its storage devises, the monitor, keyboard, and modem, hardware and software are all instrumentalities of the crime, they should also all be seized as such.

30.     As further described in Attachment B, this warrant seeks permission to locate in the SUBJECT DEVICE not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes how computers were used, the purpose of their use, and who used them. Further, as described above and in Attachment B, this application seeks permission to search and seize records that might be found in the SUBJECT PREMISES, in whatever form they are found. One form in which the records

might be found is that they are stored on a computer's hard drive, or other electronic media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis of the computer(s) or other electronic storage media seized.

31.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer hard drives can contain other forms of electronic evidence as well. In particular, records of how a computer has been used, the purposes for which it was used, and who has used it are called for by this warrant. As described above, data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration information on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals (e.g., cameras and printers for creating or reproducing images), the attachment of USB flash storage devices, and the times and dates the computer was in use. Computer file systems can record information about the dates files were created and the

sequence in which they were created. This information can sometimes be evidence of a crime, or can point toward the existence of evidence in other locations. Evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B is included within the scope of the warrant.

32. In finding evidence of how a computer has been used, the purposes for which it was used, and who has used it, sometimes it is necessary to establish that a particular thing is not present on a drive. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge. This software can allow a computer to be used by others. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present on the computer, and, if so, whether the presence of that malicious software might explain the presence of other things found on the computer's hard drive.

33. Law enforcement personnel trained in searching and seizing computer data will seize items of evidentiary value, and transport the same to an appropriate law enforcement laboratory for off-site review. The electronic media will be reviewed for the evidence described in Attachment B in accordance with and as defined by the review protocols described below.

*KFM*

FEB 2 4 2015

34.     I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

35.     I am familiar with and understand the implications of the Privacy Protection Act (PPA), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. I am not aware that any of the materials to be searched and seized from the SUBJECT DEVICE are protected materials pursuant to the PPA. If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

36.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an

FEB 2 4 2015

active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. Files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. The search for these files and file fragments can take considerable time, depending on the computer user's practices.

37.     I know from training and experience that computers or other digital devices used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the device, ownership and use of any external devices that had been attached to the computer or other digital devices, as well as ownership and use of Internet service accounts used for the Internet or cellular data network access.

38.     I know from training and experience that digital crime scenes usually include items or digital information that would tend to establish ownership or use of digital devices and Internet access equipment and ownership or use of any Internet service or digital cellular service accounts.

$KFM$

FEB 2 4 2015

## SPECIFIC METHODS OF SEARCHING FOR DIGITAL EVIDENCE

39.     I am seeking authority to search for, among other things, items containing digital data, more particularly described in Attachment B. Consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

40.     The search of a computer hard drive or other computer storage medium is a time-consuming manual process often requiring months of work. This is so for a number of reasons, including the complexity of computer systems, the multiple devices upon which computing can take place, and the tremendous storage capacity of modern day computers, and the use of encryption or wiping software. As explained above, modern day computers and storage devices are capable of holding massive quantities of data, and the volume of evidence seized in these cases can be immense. I am aware of cases in which individuals have possessed thousands of images on their computer, multiple computers and hard drives, or dozens of storage media upon which contraband images were found. I know from my training and experience, and from my discussions with trained computer forensic examiners, that a review of such quantities of evidence can take

49

FEB 2 4 2015

a significant amount of time. Second, there is a limited pool of personnel capable of conducting a forensic examination. Third, in some instances an individual may utilize encryption software or other publically-available techniques such as wiping software to hide evidence of their illegal activities. Forensic tools are available to circumvent some of these techniques; however, these tools may require a significant allocation of resources and a substantial period of time.

41. Some or all of the following search methods may be used to conduct the forensic search in this case. These methods are not listed in any particular order, nor is their listings in this affidavit a representation that they will be used in this particular case:

a. *Keyword Searches*: I know that computer forensic utilities provide the capability for a user to search for specific key words that may exist on a piece of digital media. I may use specific keywords known to be related to this case. A list of keywords utilized will be maintained with the records of the forensic examination.

b. *Data Carving*: I know that, as previously mentioned, data residue may be left in the "free," "unallocated," or "slack" space of a computer hard drive, that is, the space not currently used by active files. I further know that, as previously mentioned, many operating systems utilize temporary storage often referred to as "swap space" on the hard drive to store contents from main system memory. Such unallocated and swap space may contain the residue of files that can

be carved out, often in an automated or semi-automated fashion. I intend to use forensic tools to carve out files, in particular, image files such as JPEG and GIF files. The mere act of carving out such files does not expose me to the contents of such recovered files, but makes those files available for further relevancy checks, such as keyword searches (explained above).

c. *Opening Container Files, Encrypted Volumes, and Embedded Files*: I know that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, I intend to use sophisticated forensic tools to attempt to open any such container files that may reasonably contain evidence.

d. *File Header / Extension Checks*: I know that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual observers. The extension of a file, however, is not necessarily linked to the "header" of a file, which is a unique marking imbedded automatically in many types of files. By

51

FEB 2 4 2015

comparing the extension of a file with the "header information" of a file, it is possible to detect attempts to disguise evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools. I intend to run an automated header comparison to detect such efforts, and intend to review any such files that reasonably may contain evidence.

e. *Thumbnail / Image Views*: There is no known alternative for visually inspecting each image file. I therefore intend to examine at least a thumbnail image of each image file on the digital media whether "live," "data carved," or identified by header.

f. *Registry / Log File Checks*: I know that it is necessary in any criminal case to establish not only that a crime has occurred, but also to establish what person committed that crime. Operating systems and computer programs often maintain various administrative files such as logs that contain information about user activities at certain times. In the Windows operating system, for example, some of these files are collectively referred to as "the registry". Such files contain specific information about users, often including e-mail addresses used, passwords stored, and programs executed by a particular user. These files may also contain evidence regarding storage devices that have been connected to a computer at some time. Multiple backup copies of such files may exist on a single computer. I intend to

52

FEB 2 4 2015

examine these files to attempt to establish the identity of any user involved in the illegal activities described in this affidavit, and to establish methods (such as software used) and dates of this activity.

g. *Metadata / Alternative Data Streams*: I know that many file types, operating systems, and file systems have mechanisms for storing information that is not immediately visible to the end user without some effort. Metadata, for example, is data contained in a file that is not usually associated with the content of a file, but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that contains information identifying the camera that manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an image file that would not be immediately visible to an end user without some action taken. I know that both metadata and alternative data streams may contain information that may be relevant to the offense described in this case. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. I intend to review any such data that is flagged by any process above.

42. With rare exception, the above-listed search techniques will not be performed on original digital evidence. Instead, I know that the first priority of a

53

Case 3:15-mj-00067-KFM   Document 1   Filed 02/24/15   Page 54 of 64   FEB 2 4 2015

digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

43.     I know that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media is run through a hashing algorithm as described above, and a hash value for the entire device is generated. Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original.

44.     Criminal Procedure Rule 41 specifically states "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41 (f)(1)(B). Moreover, upon identification of contraband, the item is subject to forfeiture, and the owner has a reduced expectation of privacy in those seized devices. Consequently, should a seized device be found during the authorized forensic review to contain contraband or evidence of criminal activity, it will be retained by the United States, and may be searched without further authorization of the Court for the evidence described in Attachment B. Such a later search may be required for the following reasons:

  a. Should the execution of the warrant uncover data that may later
     need to be introduced into evidence during a trial or other

54

proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts.

b. Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

c. Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete storage media in discovery. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified.

d. The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

FEB 2 4 2015

e.  Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for evidence that is described in Attachment B but was not properly identified and segregated previously.

45.  In the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible.

## REQUEST FOR SEALING

46.  It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application. I believe that sealing this document is necessary because this investigation is not yet public, and disclosure of the facts and statements contained in this affidavit may have a significant and negative impact on this case. Specifically, if the search warrant is publicly filed, the subject of this investigation, and others associated with him, to include possible coconspirators, may flee or take steps to conceal or tamper with evidence which could seriously jeopardize the investigation.

///

KFM

FEB 2 4 2015

## CONCLUSION

47.    I submit that this affidavit supports probable cause for a warrant to search the SUBJECT DEVICE as described in Attachment A for evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251, 1591, 2422(b), and 21 U.S.C. 841(a), and to seize the items described in Attachment B.


Signature Redacted

DAWN NEER
Task Force Officer, FBI
Child Exploitation Task Force

Subscribed and sworn to before me this
_____ day of February, 2015

/s/ Kevin F. McCoy
U.S. Magistrate Judge
SIGNATURE REDACTED

KEVIN F. McCOY
United States Magistrate Judge
District of Alaska
Anchorage, Alaska

48. As used in this Affidavit Subject Premise and Subject Device mean Iphone located in Black Dodge Durango Bearing Alaska License Plate # 6mm693, Currently in possession of FBI Anchorage

VN 2/24/15
@ 5:25 pm

KFM

# ATTACHMENT A

## Location to be Searched

The property to be searched is the following:

    a. An Apple iPhone located in a black Dodge Durango with Alaska

       license plate GMM593,

and currently in the possession of the FBI, Anchorage, Alaska.

KFM

FEB 24 2015

## ATTACHMENT B

## Items to Be Searched for and Seized

<u>Child Exploitation Offenses</u>

1. The following items, images, documents, communications, records, materials, and information are to be seized wherever they may be stored or found at the location to be searched and in any form that they may be stored or found:

     a. Information, electronic records, or correspondence with JUVENILE A, JUVENILE B, or any other identified minor, involving the production of visual depictions of the minor engaging in sexually explicit conduct, including, but not limited to, text messages, electronic mail, chat logs, and electronic or other instant messages;

     b. Information, electronic records, or correspondence pertaining to the sex trafficking of JUVENILE A, JUVENILE B, or any other identified minors, or which pertain to the sex trafficking of any individual through force, fraud, or coercion, including, but not limited to, text messages, electronic mail, chat logs, and electronic or other instant messages, relating to the sex trafficking of minors;

     c. Information, electronic records, or correspondence pertaining to the coercion and enticement of JUVENILE A, JUVENILE B, or any other identified minors, to engage in any sexual conduct for

FEB 2 4 2015

which any person can be charged with a criminal offense, including, but not limited to, text messages electronic mail, chat logs, and electronic or other instant messages, relating to the sex trafficking of minors;

    d. Any images, videos, or other digital files showing JUVENILE A, JUVENILE B, or any other identified minor; and

    e. Any information, electronic records, or correspondence related to JUVENILE A, JUVENILE B, or any other identified minors, to include messages from individuals who appear to be individuals engaged in the production of child pornography, customers of prostitution, or involved in the coercion and enticement of minors;

<u>Drug Distribution Activities</u>

2.  The following items, images, documents, communications, records, materials, and information are to be seized wherever they may be stored or found at the location to be searched and in any form that they may be stored or found:

    a. Items evidencing the expenditure of drug-related proceeds, namely: receipts, purchase agreements, vehicle titles, warranty applications, homeowners or renters insurance applications and claims, photographs and/or video recordings of luxury items, jewelry, expensive vacations;

    b. Account statements, account summaries, credit card statements,

FEB 2 4 2015

banking deposit slips, handwritten-notes containing account information, account holder and amount deposited, money market accounts, overseas banking information to include routing codes, deposit receipts, canceled checks, loan agreements and loan applications;

c. Items tending to establish and document sales of controlled substance and/or other controlled substances, namely; buyer lists, seller lists, ledgers, tally sheets, pay and owe sheets, price lists, notes and diaries;

d. Address books, papers and documents bearing handwritten notations of names and associated telephone numbers, photographs and homemade videotapes; and

Computer Equipment

3. In addition, SUBJECT DEVICES may be searched for the following:

a. Evidence of who used, owned, or controlled the SUBJECT DEVICES at the time the items described in this warrant were created, edited, viewed, or deleted, such as logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

b. Evidence of malicious software ("malware"), or the lack thereof;

c. Evidence of the attachment to the SUBJECT DEVICES of other storage devices, disks, CD ROMS, or similar containers for

61

FEB 2 4 2015

electronic evidence;

d.  Evidence of the times the SUBJECT DEVICES were used;

e.  Passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT DEVICES;

f.  Evidence identifying the location from which communications regarding the enticement of minors may have been made;

g.  Contents of volatile memory related to computers and other digital communication devices that would tend to show the current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details necessary to preserve the true state of running evidence;

h.  Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address;

i.  Documentation and manuals that may be necessary to access the SUBJECT DEVICES or to conduct a forensic examination of the SUBJECT DEVICES; and

j.  Contextual information necessary to understand the evidence described in this attachment.

*KFM*

FEB 2 4 2015

62

If the SUBJECT DEVICES are found in a running state, evidence may be acquired from the devices prior to shutting the devices off.

Evidence of Ownership

4. Items tending to establish the identity of the person in control of the SUBJECT DEVICE, and any items seized from the SUBJECT DEVICE.

KFM

FEB 2 4 2015